J-S15045-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: L.M., A MINOR | : IN THE SUPERIOR COURT OF<br>:       PENNSYLVANIA<br>:<br>: |
| APPEAL OF: S.S., MOTHER | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: No. 205 EDA 2026 |

Appeal from the Order Entered December 19, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000266-2022

| | |
|---|---|
| IN THE INTEREST OF: L.A.M., JR. A<br>MINOR | : IN THE SUPERIOR COURT OF<br>:       PENNSYLVANIA<br>:<br>:<br>: |
| APPEAL OF: S.S., MOTHER | :<br>:<br>:<br>:<br>:<br>: No. 206 EDA 2026 |

Appeal from the Decree Entered December 22, 2025
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000165-2025

BEFORE:  OLSON, J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED JULY 7, 2026**

S.S. ("Mother") appeals from the December 22, 2025, decree involuntarily terminating her parental rights to her son, L.M. a/k/a L.A.M., Jr. ("Child"), born in March 2022, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2),

_____

[*] Former Justice specially assigned to the Superior Court.

(5), (8), and (b).[1]  Mother also appeals from the December 19, 2025, order changing Child's permanency goal from reunification to adoption.  Mother's court-appointed counsel, Amy Stidham, Esquire, has filed a petition to withdraw from these appeals and an accompanying brief, pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 602 Pa. 159, 978 A.2d 349 (2009).[2]  After review, we grant Attorney Stidham's petition to withdraw, affirm the termination decree, and dismiss Mother's appeal from the goal change order as moot.

We gather the following factual and procedural history from the certified record.  The Philadelphia Department of Human Services ("DHS") first became involved with this family after it received a referral on March 17, 2022, indicating that Mother had given birth in the toilet and had received no prenatal care during her pregnancy with Child.  **See** N.T., 6/24/25, at 14.  The report also raised concerns that Mother was suffering from "schizophrenia and depression" and that she lacked appropriate housing.  **Id.** at 14-15.  DHS sought and was granted emergency custody of Child the same day.  **See id.**

_____

[1] By separate decree of the same date, the trial court involuntarily terminated the parental rights of any unknown father.  No unknown father appealed or participated in the instant appeals.

[2] This Court extended the **Anders** procedure to appeals from decrees terminating parental rights in **In re V.E.**, 611 A.2d 1267, 1275 (Pa.Super. 1992), and appeals from goal change orders in dependency proceedings in **In re J.D.H.**, 171 A.3d 903, 906 (Pa.Super. 2017).

at 14. Following a shelter care hearing on March 18, 2022, the juvenile court maintained DHS's legal and physical custody of Child and provided supervised visitation with Mother. **See** Recommendation for Shelter Care, 3/18/22. Child was placed in kinship care, where he remained at the time of the subject hearing.[3] **See id.**; N.T., 10/27/25, at 6; N.T., 6/24/25, at 36-37.

On April 11, 2022, the juvenile court adjudicated Child dependent and established his initial permanency goal as reunification with Mother. The court referred Mother to Behavioral Health Services ("BHS") for consultation, evaluation, and monitoring; and the Achieving Reunification Center ("ARC") for housing services. In additional furtherance of reunification, DHS through a Community Umbrella Agency ("CUA") instituted single case plans that corresponded with the directives of the juvenile court and required Mother to address, *inter alia*, her mental health, housing, and engage in visitation with Child. **See** N.T., 6/24/25, at 17, 25, 46-47, 56-58. These objectives were clearly communicated to Mother and remained consistent through Child's dependency proceedings. **See id.** at 16.

The juvenile court held permanency review hearings at regular intervals beginning in October 2022. Between October 2022 and October 2024, the court largely characterized Mother as being moderately or substantially compliant with her reunification objectives and in making progress towards

---

[3] We observe that Child was placed in kinship care with the person thought to be his paternal great aunt prior to exclusion by genetic testing.

alleviating the circumstances that necessitated Child's placement. From November 2024 to April 2025, however, the court noted that Mother's compliance and progress was, at best, minimal. In November 2024, the court filed a permanency review ordered that created a concurrent permanency goal of adoption for Child.

During this period of time, Mother completed parenting, housing, and personal finance courses through ARC. *See* N.T., 6/24/25, at 48-50. While undocumented, it was not disputed that she also engaged in medication management related to her mental health diagnoses. *See id.* at 23-24, 45, 51, 54. Despite completing ARC housing courses, however, Mother's housing remained unstable. *See id.* at 22. Specifically, the certified record reflects that she was forced out of her apartment and into a shelter on several occasions due to domestic violence incidents with her boyfriend. *See id.* at 22, 56. Mother was also unsuccessfully discharged from mental health counseling due to lack of attendance. *See id.* at 25, 45-47, 56-58.

As best we can discern, Mother's visitation with Child progressed from supervised to unsupervised in or about March 2023, and, eventually, also included unsupervised overnight visitation in approximately April 2024. *See* N.T., 6/24/25, at 17-18, 52; DHS Exhibit 1 (Dependency Docket). The overnight visitations, however, were suspended in or about August 2024, due to domestic violence concerns between Mother and her live-in boyfriend. *See* N.T., 6/24/25, at 55-56; DHS Exhibit 1 (Dependency Docket). At the time of

the subject termination hearing, Mother's visitation with Child had reverted to supervised visits and was not consistent. *See* N.T., 6/24/25, at 19-20, 29, 52

On April 8, 2025, DHS filed petitions seeking to involuntary terminate Mother's parental rights of pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b), as well as a petition to change Child's permanency goal from reunification to adoption. The court held joint evidentiary hearings on June 24, 2025, and October 27, 2025. The trial court rendered its decision on the record and in open court on December 19, 2025. Mother was present and represented by Attorney Stidham. DHS presented the testimony of CUA case manager, Shawn Jackson. Additionally, DHS and Mother each presented documentary evidence that was admitted without objection.

Child, then three years old, was represented by a single attorney appointed as a dual guardian *ad litem*/legal counsel in the dependency matter, Daniel Silver, Esquire. Significantly, it was revealed that Child receives early intervention services, including speech therapy, occupational therapy, and behavioral therapy. *See* N.T., 10/27/25, at 6-7; N.T., 6/24/25, at 30, 61. He is non-verbal and underwent an autism evaluation in October 2025. *See* N.T., 10/27/25 at 7; N.T., 6/24/25, at 41.

By decree dated December 19, 2025, and entered on December 22, 2025, the trial court involuntarily terminated Mother's parental rights to Child pursuant to Section 2511(a)(1), (2), (5), (8), and (b). Further, by order dated

and entered on December 19, 2025, the court changed Child's primary permanency goal from reunification to adoption.

On January 16, 2026, Mother, through Attorney Stidham, filed timely notices of appeal, which this Court later consolidated *sua sponte*. Accompanying the notices of appeal, Attorney Stidham filed statements of her intent to seek to withdraw pursuant to Pa.R.A.P. 1925(c)(4) in lieu of a statement of errors complained of on appeal pursuant to Rule 1925(b). **See re J.T.**, 983 A.2d 771, 774 (Pa.Super. 2009) (holding that the decision of counsel to follow Pa.R.A.P. 1925(c)(4) procedure in a termination of parental rights case was proper). On February 20, 2026, the trial court filed a statement pursuant to Rule 1925(a)(2)(ii), wherein it referred this Court to the reasoning it placed on the record on December 19, 2025.

On March 26, 2026, Attorney Stidham filed a petition to withdraw, as well as an **Anders** brief. When counsel seeks to withdraw pursuant to **Anders** and its progeny, this Court may not review the merits of the appeal without first addressing counsel's request to withdraw. **See In re Adoption of B.G.S.**, 240 A.3d 658, 661 (Pa.Super. 2020) ("When faced with a purported **Anders** brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw.").

In order to successfully withdraw pursuant to **Anders**, counsel must: (1) petition the court for leave to withdraw and aver that, after making a conscientious examination of the record, he has determined that an appeal

would be frivolous; (2) furnish a copy of the *Anders* brief to the appellant; and (3) advise the appellant that they have the right to retain private counsel or bring additional arguments to the court's attention. *B.G.S.*, 240 A.3d at 661 (citation omitted). To confirm client notification has occurred, counsel must provide a copy of the letter advising the appellant of their rights in conformity with *Commonwealth v. Millisock*, 873 A.2d 748, 751 (Pa.Super. 2005). *See id.*

Additionally, our Supreme Court has set forth the following substantive requirements for *Anders* briefs:

> [W]e hold that in the *Anders* brief that accompanies court-appointed counsel's petition to withdraw, counsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Santiago*, 602 Pa. at 178-79, 978 A.2d at 361.

In her petition to withdraw, Attorney Stidham certified that she made a conscientious review of the record and determined that Mother's appeals are frivolous. *See* Application to Withdraw, 3/26/26, at ¶ 4. Contemporaneously, Attorney Stidham also sent Mother a *Millisock* letter which properly advised Mother of her right to retain alternative private representation or raise

supplemental arguments on her own.[4]  *See* Letter, 6/26/26.  This letter also provided Mother with copies of Attorney Stidham's petition to withdraw and *Anders* brief.  Thus, we conclude that counsel has sufficiently complied with the procedure and notice requirements attendant to *Anders* pursuant to *Millisock*.

Likewise, upon review, Attorney Stidham's *Anders* brief complies with the requirements set forth in *Santiago*, *supra*.  Attorney Stidham's *Anders* brief provides a sufficient summary of the factual and procedural history of this matter, which includes citations to the certified record.  The *Anders* brief also contains an adequate discussion of the relevant law of the Commonwealth.  While Attorney Stidham raises four potential issues, noted below, which may arguably support Mother's appeal, she ultimately concludes that these grounds for Mother's appeal are frivolous.  She further explains her reasons for concluding as such based upon the relevant facts and law.  Based upon the foregoing, we conclude that Attorney Stidham's brief complies with the requirements of *Santiago*, *supra*.  Thus, Attorney Stidham has complied with the technical and procedural requirements of *Anders*.[5]

---

[4] We observe that this Court directed Attorney Stidham to file corrected *Millisock* letters on two occasions properly advising Mother of her right to retain private counsel or bring additional arguments to the court's attention. *See* Orders 6/2/26 & 6/11/26.  As indicated, Attorney Stidham's most recent letter is now compliant.  *See* Letter, 6/26/26.

[5] To date, Mother has not responded to Attorney Stidham's petition to withdraw and *Anders* brief.

Having concluded that Attorney Stidham has complied with the requirements of **Anders**/**Santiago**, we must next "conduct a review of the record to ascertain if on its face, there are non-frivolous issues that counsel, intentionally or not, missed or misstated." **Commonwealth v. Yorgey**, 188 A.3d 1190, 1197 (Pa.Super. 2018) (*en banc*).

Attorney Stidham's **Anders** brief raises the following issues for our review:

> 1. Did the trial court fail to ensure [] Child's right to counsel pursuant to 23 Pa.C.S.[A.] § 2313(a)?
>
> 2. Did the trial court commit an error of law and abuse its discretion by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(1), (2), (5), and/or (8)?
>
> 3. Did the trial court commit an error of law and abuse its discretion by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(b)?
>
> 4. Did the trial court commit an error of law and abuse its discretion by changing [] Child's permanency goal from reunification with parent to adoption?

**Anders** Brief at 3 (reordered for ease of disposition) (trial court's answers omitted).

With respect to the first issue in the **Anders** brief, Attorney Stidham asserts that Mother may argue that the trial court failed to appoint counsel for Child insofar as the trial court failed to determine that no conflict existed with respect to Attorney Silver, Child's sole legal representative. **See Anders** Brief at 27. Attorney Stidham contends that Mother may further argue that

- 9 -

Attorney Silver "did not adequately represent [Child's] interests" due to his "fail[ure] to ascertain and advocate for Child's position." *Id.* at 28.

Section 2313 of the Adoption Act provides, in relevant part:

> **(a) Child.**—The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian *ad litem* to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

23 Pa.C.S.A. § 2313(a).

In *Interest of H.H.N.*, 296 A.3d 1258 (Pa.Super. 2023), this Court stated:

> Our Supreme Court has explained that "Section 2313(a) requires the appointment of counsel who serves the child's legal interests in contested, involuntary [termination of parental rights] proceedings." *In re Adoption of L.B.M.*, 639 Pa. 428, [442,] 161 A.3d 172, 180 (2017) (footnote omitted). Further, the *L.B.M.* Court held that "the failure to appoint counsel for a child involved in a contested, involuntary termination of parental rights proceeding is a structural error and is not subject to harmless error analysis." *Id.* at [446, 161 A.3d at 183]. Further, the failure to appoint counsel to represent a child's legal interests pursuant to Section 2313(a) is a non-waivable error. [*In re T.S.*, 648 Pa. 236, 248, 192 A.3d 1080, 1087 (2018)]. Subsequently, the Supreme Court clarified that "trial courts are obligated by Section 2313(a) to appoint counsel to serve the critical role of a child's attorney, zealously advocating for the legal interests of the child who otherwise would be denied a voice in the [involuntary] termination of parental rights proceedings." *In re Adoption of K.M.G.*, 663 Pa. 53, [79,] 240 A.3d 1218, 1233-34 (2020) (citation omitted). . . .

*H.H.N.*, 296 A.3d at 1263-64 (some brackets and parentheses in original).

"[A] child's legal interests . . . are synonymous with the child's preferred

outcome," whereas a child's best interests encompass what is "best for child's care, protection, safety, and wholesome physical and mental development, regardless of whether the child agrees." *Matter of Adoption of A.C.M.*, 333 A.3d 704, 708 (Pa.Super. 2025) (citations omitted). In order to "ensure that the child's legal interests are presented to the trial court," this Court has explained that "a single attorney cannot represent a child's best interest and legal interest if those interests conflict." *K.M.G.*, 663 Pa. at 79, 82, 240 A.3d at 1234, 1236. Further, while "[a]n attorney acting as a child's legal counsel must, at a minimum, attempt to ascertain the child's preference and advocate on the child's behalf," legal counsel for a child is accorded "significant deference" in their role. *In re P.G.F*, 665 Pa. 37, 56, 247 A.3d 955, 966 (2021).

Notwithstanding, our Supreme Court has concomitantly recognized that a child may be too young and/or otherwise unable to express a preference as to the outcome of the proceedings. *See T.S.*, 648 Pa. at 252-53, 257, 192 A.3d at 1089-90, 1092-93 ("[I]f the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act . . . is satisfied where the court has appointed an attorney-GAL who represents the child's best interests during such proceedings."). In such cases, a court may presume that no conflict exists between the child's legal interest and best interest. *See*

*id.* at 252, 192 A.3d at 1090. Thus, Section 2313(a) does not require the appointment of separate legal counsel to advance a child's "unknowable preference." *Id.* at 252-53, 193 A.3d at 1090 (footnote omitted).

In the case *sub judice*, the trial court appointed Attorney Silver to represent Child as GAL and legal counsel in the dependency proceeding. *See* Appointment Order, 3/18/22. Despite the absence of a separate appointment order entered in the termination matter, Child was represented by Attorney Silver at all relevant hearings. As such, we decline to elevate form over substance. *See T.S.*, 648 Pa. at 253, 192 A.3d at 1090 n.19 (recognizing that it would "be a better practice for the court to place an order on the record formalizing the GAL's role for termination purposes" but finding no reversible error when it was clear that the child received appropriate legal representation despite the absence of a formal appointment order.). Furthermore, Child was only three years old at the time of the subject hearing and was non-verbal and unable to express his preferred outcome. *See* N.T. 6/24/25, at 41. We, therefore, apply the presumption of *T.S.* that there is no conflict between a child's best interest and legal interest where a child is "very young and preverbal." *T.S.*, 648 Pa. at 257; 192 A.3d at 1092-93; *c.f. Interest of N.M.D.*, 354 A.3d 494 (Pa.Super. 2026) (unpublished memorandum at *4) (declining to apply the *T.S.* presumption where a three-and-a-half-year-old child did not have any documented developmental delays or medical conditions). Given that Child's position was not ascertainable, to the extent

that Attorney Stidham further asserts that Mother may raise Attorney Silver's failure to ascertain and advocate for Child's preference, this argument is without merit. Thus, we agree with Attorney Stidham that any issue concerning Child's right to legal counsel pursuant to Section 2313(a), as interpreted by *L.B.M.* and its progeny, is frivolous.

Attorney Stidham's next two issues involve the decree involuntarily terminating Mother's parental rights. Our standard of review in this context is well-established:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.
>
> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.
>
> In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing

- 13 -

as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa.Super. 2022) (internal citations and quotation marks omitted).

The involuntary termination of parental rights is governed by Section 2511 of the Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the trial court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013); *see also* 23 Pa.C.S.A. § 2511(b). This Court need only agree with the trial court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm termination. *See In re K.R.*, 200 A.3d 969, 979 (Pa.Super. 2018) (*en banc*) (citation omitted).

Accordingly, we analyze the decree involuntarily terminating Mother's parental rights to Child pursuant to Section 2511(a)(8) and (b),[6] which provide as follows:

_____

[6] Given our disposition relative to Section 2511(a)(8), we need not review and make no conclusions as to the trial court's findings with respect to Section
*(Footnote Continued Next Page)*

- 14 -

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . .

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(8), (b).

In order to satisfy Section 2511(a)(8), the petitioner must prove that:

(1) the child has been removed from the parent's care for at least 12 months;

(2) the conditions which led to the removal or placement still exist; and (3)

termination of parental rights would best serve the needs and welfare of the

_____

2511(a)(1), (2), and (5). ***See K.R.***, 200 A.3d at 979 (observing this Court may review one subsection of Section 2511(a) "[w]ithout considering the [trial] court's determinations" under any other subsection).

child. *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa.Super. 2018). Section 2511(a)(8) does not necessitate an evaluation of a parent's willingness or ability to remedy the conditions that led to the removal of the child. *See In re M.A.B.*, 166 A.3d 434, 446 (Pa.Super. 2017). Rather, our inquiry is focused upon whether the "conditions" which led to a child's removal or placement have been "remedied" such that "reunification of parent and child is imminent at the time of the hearing." *In re I.J.*, 972 A.2d 5, 11 (Pa.Super. 2009). This Court has acknowledged:

> [T]he application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen months, in which to **complete** the process of either reunification or adoption for a child who has been placed in foster care.

*Id*. at 11-12 (emphasis in original; internal citations omitted).

Finally, this Court has also explained that,

> while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

***In re Adoption of C.L.G.***, 956 A.2d 999, 1009 (Pa.Super. 2008) (*en banc*) (cleaned up).

Initially, it is undisputed that Child had been removed from Mother's care for more than three years due to the concerns related to Mother's housing and severe mental illness. ***See*** N.T., 6/24/25, at 14-15. The trial court explained that Mother failed to consistently engage in mental health treatment, and her mental health issues persisted. ***See*** N.T., 12/19/25, at 11-12. In addition, the court found that Mother's housing instability remained ongoing, which the record supports. ***See id.*** at 12-13.

CUA case manager, Shawn Jackson, confirmed that Mother reported to DHS that she had been previously diagnosed with mental health diagnoses of schizophrenia and depression. ***See*** N.T, 6/24/25, at 18. While Ms. Jackson acknowledged Mother's engagement in medication management, she noted Mother's lack of participation in mental health treatment. ***See id.*** at 23-24, 45, 51, 54. Notably, Mother was discharged from counseling with her chosen health care provider shortly after the treatment commenced in 2024. ***See id.*** at 25, 45, 47, 57. As a result, Mother's mental health issues endured. Specifically, Ms. Jackson testified:

> A. . . . Mother did express to me that she still hears voices in her head, numerous different people that she hears. Some of them say bad things when she's with [Child]. Some of them tell her to go outside. Some of them -- they're just different things that her voices tell her to do.
>
> Q. Did they -- some of them say bad things when she's with [Child]. What did you mean by that?

A. They would say how bad his haircut is. She told me kind of what she has on. Just negative things about [Child] when she's with him. She did express to me that the voices say those things when she's at these community visits.

*Id.* at 19. Moreover, Ms. Jackson testified that Mother admitted that her mental health issues still existed. *See id.* at 41-42.

At the termination hearing in June 2025, Ms. Jackson testified to Mother's ongoing housing instability, as follows:

Mother just moved to a new apartment. She got kicked out a few times during her previous relationship. I believe it was like three times she got kicked out of that apartment. And just kind of back and forth from shelters. That is just throughout the life of the case. It's been a lot of instability with housing.

*Id.* at 22. Furthermore, Ms. Jackson observed that Mother's new apartment was inappropriate for Child. *See id.* at 28. She stated:

So Mother has no oven at this time to cook any food. There was little to no food in the home. . . . I believe it's like a skillet that she has. But the actual oven is broken. . . . There were a lot of holes in the wall. There [were] windows that are broken. There are no -- there was no hot water in the bathroom. She has to wash her hands in the bathtub. Just the overall condition of the home was not up to par. There is no indication[] that a child would -- would live there anyway.

But CUA did provide her with the -- you know, the toddler bed, the furniture for him, but that is also not in the home as well. So it just wasn't appropriate for the baby to come back home today. . . .

*Id.* Ms. Jackson, therefore, testified that CUA had ruled out reunification with Mother at that time. *See id.* at 31.

- 18 -

Based upon the foregoing, it is clear that Child was removed from the care of Mother far in excess of the statutory 12-month minimum and that the conditions that led to Child's removal as they relate to Mother persisted at the time of the subject hearing. Accordingly, the first and second prongs of Section 2511(a)(8) are satisfied.

Finally, turning to the third prong of Section 2511(a)(8), for the reasons stated *infra* regarding Section 2511(b), we discern no abuse of discretion by the court in concluding that the termination of Mother's parental rights will best serve Child's needs and welfare pursuant to Section 2511(a)(8). ***See In re Adoption of G.W.***, 342 A.3d 68, 89 n.20 (Pa.Super. 2025) (*en banc*) (applying the precedent interpreting Sections 2511(a)(8) and (b) "congruently and using the same legal analysis" for both subsections).

Specifically, Section 2511(b) gives "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b); ***see also T.S.M.***, 620 Pa. at 628, 71 A.3d at 267. Our Supreme Court has generally outlined this inquiry, as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

- 19 -

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (cleaned up).

"The extent of any bond analysis . . . necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted). However, our Supreme Court has concluded that "only a necessary and beneficial" parental bond should be maintained. *K.T.*, 296 A.3d at 1109. A bond is considered to be "necessary and beneficial" if its severance would cause "extreme emotional consequences" or significant, irreparable harm. *Id.* at 1109-10. This Court has recognized that,

concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent. . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and its mental and emotional health than the coincidence of biological or natural parenthood.

- 20 -

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa.Super. 2008) (internal citations and quotation marks omitted).

Furthermore, "bond, plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *K.T.*, 296 A.3d at 1109. Therefore, it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents." *M.E.*, 283 A.3d at 839 (cleaned up).

In terminating Mother's parental rights pursuant to Section 2511(b), the trial court found that, although a bond had once existed between Mother and Child, it had deteriorated. *See* N.T., 12/19/25, at 13. The court determined that Child instead shared a parent-child bond with his pre-adoptive kinship parent. *See id.* at 14. The court stated, as follows:

> . . . CUA did testify that they believe that at one point there was a parent/child bond between [Child] and Mother.
>
> CUA testified that that bond had dissolved over time due to Mother's lack of active engagement with visits. . . . CUA expressed concerns about Mom being able to meet [Child's] special needs and his medical needs, as evidenced by the fact that Mom had only attended one medical appointment in the last year and a half.
>
> Mom's counsel was arguing that there is bond, because CUA testified at one point that [Child] gets excited to see his mother, and knows when he's going to visit with his mother. However, Pennsylvania Superior Court has held that a child's feelings of affection towards their parents do not establish that a beneficial bond exist[s]. . . .

- 21 -

CUA also testified that [Child] is very bonded with his [kinship] parent. He had been in that [kinship] home since his discharge from the hospital, right after his birth. CUA testified that [Child] had a parent child bond with the [kinship] parent.

That the [kinship] parent provides stability for [Child] and that the home was pre[-]adoptive. And that the true parental bond was with the [kinship] parent. As such, I am finding that DHS has met its burden of proof by clear and convincing evidence.

*Id.* at 13-14. Upon review of the certified record, we discern no abuse of discretion.

Indeed, Ms. Jackson testified that, in her opinion, a parent-child bond did not exist between Child and Mother. *See* N.T., 6/24/25, at 35; *see also* N.T., 10/27/25, at 16. Mother's visitation, which began as supervised, progressed to unsupervised visitation and then unsupervised overnight visitation in or about April 2024. *See* N.T., 6/24/25, at 17-18, 52; DHS Exhibit 1 (Dependency Docket). However, in August 2024, the court suspended Mother's overnight visitation, and, ultimately, her visitation with Child reverted to supervised visits in the community. *See* N.T., 6/24/25, at 19-20, 52, 55; DHS Exhibit 1 (Dependency Docket). Ms. Jackson characterized Mother's recent visitation as "sporadic." N.T., 6/24/25, at 19, 29. Specifically, Mother "only had one visit [in June], no visits in May, and . . . one visit in April." *Id.* at 19. Further, Ms. Jackson explained:

Mother doesn't -- she doesn't inquire about [Child]. She does not ask how he's doing. She does not engage in knowing his early intervention services. I'm not sure if Mother's aware of his early intervention services. She does not attend any medical [or] dental appointments. She has not attended any appointments in the last

- 22 -

year. . . . [S]he's not engaging herself into really knowing [Child] at this time. . . .

*Id.* at 29. Consequently, Ms. Jackson expressed that Child would not experience any irreparable harm if Mother's parental rights were terminated. *See id.* at 31, 34.

Moreover, referencing Mother's mental illness and housing instability, Ms. Jackson testified to her belief that Child is not safe in Mother's custody for any lengthy period of time. *See id.* at 21-22. She stated, "I believe that it will overwhelm Mother if she has [C]hild for a long period of time. But for a few hours, I don't believe that he is unsafe in her care." *Id.* at 22.

Conversely, Ms. Jackson testified that Child is "completely bonded" with his pre-adoptive kinship parent with whom he has resided since birth. *Id.* at 34, 39. As to her observation of Child's relationship with his kinship parent, Ms. Jackson described, "It's very bonded, very comfortable. [Child] looks to his [kinship] parent for -- for everything at this point, for comfort, for safety, for security, and just overall parenting." *Id.* at 37. As indicated *supra*, Child receives early intervention services, including speech therapy, occupational therapy, and behavioral therapy. *See* N.T., 10/27/25, at 6-7; N.T., 6/24/25, at 30, 61. He is non-verbal and underwent an autism evaluation in October 2025. *See* N.T., 10/27/25 at 7; N.T., 6/24/25, at 41. According to Ms. Jackson, Child's kinship parent affords him the stability he requires as a result of these special needs. *See id.* at 38. Child's kinship parent likewise provides for Child's daily, medical, and financial needs. *See id.* As such, Ms. Jackson

- 23 -

testified, "I believe that it's not in his best interest to be -- to be removed from that home." *Id.* at 38.

Thus, the record amply demonstrates that Child does not share a necessary and beneficial bond with Mother. *See K.T.*, 296 A.3d at 1109-10, 1113. We discern no abuse of discretion in the court's conclusion that Child's developmental, physical, and emotional needs and welfare will be served by the termination of Mother's parental rights pursuant to Section 2511(b).

Based on the foregoing independent analysis of the trial court's termination of Mother's parental rights, we agree with Attorney Stidham that the appeal from the decree terminating Mother's parental rights pursuant to Section 2511(a)(8) and (b) is wholly frivolous and our review of the record does not reveal any overlooked non-frivolous issues.

Given our disposition concerning termination, Mother's appeal from the goal change order is moot. *See In re Adoption of A.H.*, 247 A.3d 439, 446 (Pa.Super. 2021) ("[T]he effect of our decision to affirm the orphans' court's termination decree necessarily renders moot the dependency court's decision to change [the c]hild's goal to adoption[.]").

For the foregoing reasons, we grant Attorney Stidham's petition to withdraw. We affirm the termination decree and dismiss the goal change order as moot.

Counsel's petition to withdraw granted. Decree affirmed. Appeal from goal change order dismissed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/7/2026